Argument not to exceed 15 minutes per side. Mr. Nash, you may proceed for the appellate. May it please the court, Mr. Lieberman. My name is Patrick Nash. I represent the petitioner, Azra Basich. I would like to reserve two minutes for rebuttal. Your Honors, my client is a Croatian. She has lived in the United States for over 20 years and she lawfully came here and she ultimately obtained her United States citizenship in 2007. Her country of origin, Croatia, in the Balkans, for centuries has been the location of lots of strife. Ethnic, economic, national strife that has unfortunately all too often boiled over into open warfare in that section of the world. In the early 90s, my client was drawn into one of those instances at first as a prisoner. She was taken prisoner by Serbian military forces and then shortly after obtaining her release, she herself joined the military, the Croatian military, and was a soldier in the armed conflicts that were going on in the region at that time. In about 1994, she fled the region and came to the United States as a refugee and has been here ever since. This case represents an attempt to bring her back, to take her back to the very location where this conflict occurred and to stand trial in a local court in a Serbian-dominated republic, Republika Srpska, and to face charges, allegations that are over 23 years old. And this is being done under a treaty that itself is 110 years old. For two reasons, that should not be allowed. The first of the reasons is that the treaty at issue here does not allow for the extradition of United States citizens. And the second reason is that the treaty requires, before extradition can be had, the production of an authenticated arrest warrant and no such warrant has been produced in this case. Article 5 of the treaty is the article that deals with the citizenship prohibition and it reads that neither of the contracting parties shall be bound to deliver up their own citizens. Now that language, I would submit, is somewhat unusual upon the first reading of it, but the Supreme Court has addressed it in the Valentine case and has told us what it means. It means that the Supreme Court is not obliged to extradite a citizen and therefore, if there is no other authority to do so, there's no harm. Right? I would disagree with Your Honor. I think what Valentine says is, and what the holding of the case is, is that that clause, which was selected from among other clauses that could have been used, that clause means that the executive is without power to extradite. Unless there is other power. Valentine explicitly talked about Congress having the authority to define what the powers of extradition are. And in Valentine, there wasn't any congressional authority. So the court said, you know, there may be authority here, but absent some authority coming from Congress, it can't be done. But that doesn't mean Congress can't do it. And here, don't we have statutory authority? That's a multi-part question. I'm sorry. No, and let me, I want to address each one of those. Those are excellent points. Valentine does talk about legislation, extradition by legislation. A reading of the case, though, those comments in context talk about legislation in situations where the United States is occupying another country. It says, go ahead, because that's not exactly what it says. Go ahead. Well, that's the way I read the case, Your Honor. But certainly it has language in there that says legislation, or extradition by legislation. Now, to back up a step, in a vacuum, if you had a treaty that didn't address the idea of extraditing citizens, and that was truly an open issue, Valentine could be read as saying, Congress can fill that void, can fill that vacuum. But here, we have a treaty that chose language. We have countries that chose language to address the extradition of citizens issue. There was no void. There was no vacuum. Treaties at that time were, some of them allowed for the extradition of citizens, required it. Some of them made it discretionary with the executive branch. Those were clauses that were used and were chosen sometimes. This particular clause, in cases predating Valentine, the McCain case, for instance, had been construed to mean this clause forbids the extradition of citizens. That was the holding in McCain. That was the context leading up to the selection of this clause by Serbia and the United States when they drafted the treaty. So it wasn't a situation where there was a vacuum, where Congress could then legislate. It was a situation where there was a definite choice by these countries to decide upon this particular clause. And so the later legislation that Your Honor has referred to, instead of the treaty, can change the powers and the obligations of the parties to the treaty. And Your Honor, that leads into the idea of whether that legislation is constitutional and can be applied here. Of course, we're talking about the International Narcotics Control Act. So the state of the law, the state of this treaty stayed the same all the way from its enactment and its ratification until 1990 when the International Narcotics Control Act was passed. We know from the case law and from the legislative history that the point of that act was to deal with narcotics, and specifically Andean countries and drug lords and whether or not we could extradite drug lords back and forth between these countries. Article 2 of the Constitution, the treaty clause of that article, requires any treaty to be ratified by two-thirds of the Senate. The International Narcotics Control Act was not. It was passed by a voice vote on the floor of the Senate, and there's no record of the number of senators that concurred. So it did not comply with the treaty clause of the Constitution. So you're saying that the Supreme Court has said that there is no authority in the Congress to do anything with regard to extradition that isn't explicitly laid out in the treaty? No, I'm not saying that, Your Honor. I'm saying that where there is a treaty and where it is preexisting and extradition is already defined by that treaty, if it's going to be changed by Congress, if that's going to be changed, then it has to go through the treaty clause. And what is your best authority for saying that it has to go through the treaty process? Well, the Constitution itself, the New York Chinese TB case and the Govia case both talk about substantive amendments to the treaty having to comply with the treaty clause requirement. But in addition, Your Honor, to that, if you get past that issue, the government has raised the idea of this last-in-time rule, that a Congress has the authority to do it that way. And we've acknowledged that that rule has been recognized, but there's a very important caveat behind that rule. Because there is a strong presumption and a strong rule that international treaties should be complied with as they were written, in order for the last-in-time rule to apply, Congress's intention to modify the treaty has to be, of the clearest expressions, has to be very clearly set out and unambiguous. And of course, in this case, when Congress passed the International Narcotics Control Act, there wasn't any indication that the Serbian treaty or this article of that treaty or this particular language in that treaty was at all Congress's intent. They were clearly dealing with Andean countries, drug-related issues, drug wars. Certainly not any expression, much less the clearest of expressions, that they intended to modify this treaty. So for either or both of those reasons, we do not believe that the International Narcotics Control Act... The language in the treaty that says that neither of the signatories to the treaty shall be bound to deliver on the citizens' needs, that they are prohibited from doing that? That is what Valentine's holding was, Your Honor. That when the parties picked this clause, they chose a clause under which the President has no discretionary power. By the fact that they chose this clause, the countries chose to divest the executive of the power to extradite citizens. If the treaty had just been silent about extradition, had said not one way or the other anything about extradition of citizens, then I think we're in a position where Congress can fill that void. But the way that Valentine has read this, that was a conscious choice. I'm really struggling with the idea that shall not be bound to means may not, period. Because that's what you're arguing for a statute. And I acknowledge at the outset that when you read that language, it's odd language. And certainly if you read that language in effect... How is it odd language? Well, I would submit that if you read it without the benefit of Valentine, then Your Honor's point, I think, is very valid. But when you read it in conjunction with how Valentine construed it... Well, Valentine said, if you've got this language and the treaty doesn't say something that you want it to say, the only remedy is either to go through the treaty process and amend the treaty, or Congress has that power. So if Congress, you say Congress would convene the treaty, but Congress not only has the power, but did in fact enact legislation. They certainly did, and they certainly do have the power. The question is, did they comply with the last-in-time rule? Were they specific enough in the legislation targeting this treaty and this language for the courts to say, yes, this language substantively changes a treaty that's in existence and has been in existence for an extended period of time? I think that's the issue about Congress's power. Thank you. The second reason, Your Honor, that my client cannot be extradited is the fact that no warrant for her arrest, no newly authenticated warrant for her arrest has been produced. That's Article 3 of this treaty. It's a mandatory prerequisite to any extradition. There are treaties that allow for warrant equivalents to be in place of the actual warrant. This treaty is not one of them. This treaty requires a warrant. So would it have to say warrant? Certainly not, and we do not make that argument. The documents that have been submitted don't say warrant, but that's not the reason we say that they're not the warrant. The reason that the documents submitted are not the warrant is those documents reference the warrant. They reference a warrant, an international warrant, multiple times, but that international warrant that is referenced in these other documents itself was never produced. Instead, the government has insisted, the Bosnian government has insisted on the United States accepting these warrant equivalents, and the treaty just simply doesn't allow for that. So for either or both of those reasons, we think that the petition for habeas corpus should be granted, and my client, who has been incarcerated now for almost exactly five years, should be released. Thank you. Good morning, Your Honors. May it please the courts. David Lieberman, court of the United States. The court should affirm the district court's denial of habeas rupture. On the first one, the Secretary of State has the authority to order Ms. Basich's extradition to Bosnia. That's under Section 3196. There's nothing in the plain language of the extradition treaty, and nothing in Valentine that prevents that. The language is clear. Neither of the parties shall be bound to deliver up its own citizens. The government disclaimed a duty to order up its own citizens with that language, but a disclaimer of a duty is not a flat prohibition. Moving to Valentine, Valentine had a very simple ruling. The executive branch needs positive authority to order the extradition of U.S. citizens. The treaty, in that case, which contained the same language, did not grant that positive authority, and then right at the end, the language referenced by Judge Batchelder, the court says, however regrettable such a lack of authority may be, remedy lies with the Congress or with the State. Congress has chosen the statutory path here in 3196, filling the gap that Valentine recognized. This is completely complementary to the treaty and completely authorized under Congress. How do you respond to the argument that that's all well and good, except that whatever Congress does has to be explicitly directed, specifically directed towards a particular treaty, which doesn't contain the authority? We disagree with that, and the example that I can give the court is the Braillard decision that we cited in our briefs, which was the Vienna Convention on Consular Relations, enacted in 1963, where we afforded certain rights to foreign nationals arrested in this country. AEDPA comes along in 1996, a statute that this court is quite familiar with, and in Braillard, the Supreme Court mentions that AEDPA circumscribed the ability of Mr. Braillard in that case to raise his Vienna Convention rights, even though AEDPA never mentioned the Vienna Convention treaty. It contained no list of the treaties, it just referenced federal rights, including treaty rights. And to Mr. Nash's point, this statute is sufficiently specific to address the extradition treaty here. The language on its face, the statute applies where the applicable treaty, the extradition treaty, does not obligate the United States to extradite U.S. citizens. That describes this treaty to a T. And your view would be in every other treaty that contains that. Exactly, Your Honor. And this is actually, to the extent that the court finds legislative history relevant, both sponsors of this legislation in the House and the Senate said that the statute is designed to address those pre-Valentine treaties containing the same language, and neither party shall be bound to deliver up its own citizens. That's clear as day in the government's view. There were, in 1990, 34 treaties, extradition treaties, on the books that meet that definition. We don't think that Congress has to go through all of its treaties and list which ones could possibly be impacted. It's clear from the language. So this statute is authorized where Congress says are there one power, nothing in Valentine, and that's the act. To the second claim, Bosnia has submitted an arrest warrant in this case. It submitted two documents, the Bosnian judge's decision and order of detention, that is Government Appendix 21, and then the directive issued by the Bosnian prosecutor for Ms. Basic's arrest, that's at Government Appendix 3. The Bosnian government has stated, this is the Bosnian Justice Ministry, at Government Appendix 26, these documents serve as both the arrest warrant for this matter. Well, serving as a... I mean, look, this is what we're giving you. It doesn't mean it is a warrant. He claims there was an international warrant. There's no such warrant. Two responses, Your Honor. First, this exact same question came up by the magistrate judge in this case in his November 4, 2011, order. And then the government brought back, I want to be clear because there's two dockets in this case. This is the magistrate judge's docket, document, Record Entry 74-2, a document from the Bosnian prosecutor and from the Bosnian Ministry of Justice, and it reads, the directive of the district prosecutor in Dubose to the take Ms. Basic into custody to face the 1993 war crimes charges pending against her. So that's the Bosnian government's view, and on these questions, U.S. courts have long deferred to the foreign government's statement that it has satisfied its own domestic law. The second part of your question, Judge White, what is the international arrest warrant? Well, this same document, this is, again, on the magistrate judge's document, document 74-2, the Bosnian government said our reference in these documents to the international arrest warrant is shorthand for Interpol assistance. So when, after, including in this country, when Bosnia or the United States, when we seek to extradite somebody, we file a document with Interpol seeking, announcing that we are seeking the assistance of the international community in securing the fugitive's arrest. It's called a red notice. A number of prosecutors informally refer to it as an international arrest warrant. The same, on the magistrate's document, again, record entry 74-3, the United States government has provided an affidavit saying we do this too, we informally refer to this international arrest warrant as Interpol procedures, and we provided a copy of the Interpol notice, the red notice. Now, I want to be clear, the government does not think that that is the arrest warrant that the treaties contemplate. The treaties contemplate the arrest warrant issued by the jurisdiction. But even assuming that Ms. Bostic's position is right, the document is still before the court. But again, I go back to the fact that we have the Bosnian government, both the prosecutor and the Bosnian justice ministry, stating these are, this is the arrest warrant under our law, and courts traditionally defer to the jurisdiction to refer to that statement. And if there's any doubting that front, the magistrate judge held a hearing, it issued an explanation, the district court issued an explanation, noting that these documents meet any definition of an arrest warrant that we would use in this country. They identify Ms. Bostic, her location in Lexington, Kentucky, they restate that reasonable cause exists to believe that she committed the charged offenses in this case, and they order Ms. Bostic's arrest and detention. That is what the definition of an arrest warrant, I still am not clear as to what Ms. Bostic's position as to why, substantively, these documents don't fit the bill. The magistrate judge and the district court correctly rejected this position. Unless the court has any further questions or concerns, the government asks that the court affirm the denial We do not. Thank you, Your Honor. On the issue of the citizenship extradition, and the requirement of specificity to change the treaty, there are at least two cases that we've listed, the PLO case and the Republic of Iran case, where the very reason the attempt by Congress to change a treaty was rejected was because the statute did not reference the specific treaty that was intended by Congress to be altered. The United States government, Congress has no problem listing treaties when they want to. When you look at the extradition statutes, there's a lengthy list of all of the extradition treaties in force, and so it would not have been burdensome or unreasonable to expect that if they wanted, when they passed the Narcotics Control Act, to impact a certain treaty, that that should have been listed as part of the legislative process. What were the two cases you just cited? I'm sorry, the PLO, the Palestine Liberation Organization case, and the Republic of Iran case. Both are in the briefs. On the warrant issue, Your Honor, I would point the court to the Handanovic case, which is another Bosnian extradition case. In that case, the order and decision of detention, which the government relies on here as being the warrant, that same sort of order was presented to the Handanovic court, and it was considered to be a document preliminary to the issuance of the warrant. And in Handanovic, a second document, the actual warrant, was produced by Bosnia, and that was deemed to satisfy the warrant requirement under the treaty. In regards to these Interpol notices and these red sheets, the Interpol notice is not what is referenced in the Bosnian documents. They referenced a warrant that was going to be issued by a ministry in Sarajevo, a ministry of Bosnia, and that's the document that we say is required to be produced. Thank you. Thank you, counsel. The case will be submitted. There will be no further cases to be argued this morning.